Please call the next case. 5-13-0-4-8-5, Sallie Williamsville v. Workers' Compensation Commission. Counsel, Mr. McGovern, you may proceed. May it please the Court, Counsel. In April of 2008, Sallie was leaving a sales call at Carbondale Elementary School. She sells copiers for the respondent throughout the entire Southern Illinois region. In fact, she's a traveling salesperson in every sense of the word. As she was walking back to her car, on the sidewalk, she stepped on the edge of the sidewalk and fell. Was it a slip or a trip? It's been described both ways in the record. But nevertheless, she did fall on her left side. She reported this immediately to her company. That's not in dispute. She saw a doctor shortly after the fall, but she did not state anything in those records about the fall. And that troubled the arbitrator, right? Pardon me? That troubled the arbitrator. Yes, it did, Your Honor. She admitted that, no, I went to the doctor for my sinuses. She did testify that I had a steroid injection into my right hip as opposed to my left hip, because my left hip was bothering me. But again, that's not mentioned in those initial medical records. Time went by. In December of 2008, her hip started bothering her such that she felt she needed medical treatment. She received that medical treatment. An x-ray was ordered, and it turns out she had avascular necrosis of her left hip. She saw a specialist. The specialist's first surgery was a decompression of a sort to revascularize the hip. And subsequently, she had a total hip replacement. Now, the interesting part is that we had taken depositions of the doctors in this case prior to the hip replacement, but both doctors admitted at that time that she would eventually need a hip replacement. It was subsequent. It seemed to me that the case ultimately came down to the commission, the arbitrator and the commission, adopting the opinion of Steinkopf over Kowalski, which they can do. But what I want you to hone in on, one of the things that you have here in the battle of the experts you don't have in every case is the arbitrator gave a reason why he adopted Steinkopf over Kowalski, because he felt that Steinkopf's opinion, as you know, was incomplete and inaccurate. Kowalski believed the claimant had sought medical care for the hip injury and a steroid injection was administered for that condition, even though there's a dispute about that. So tell us why the commission couldn't have adopted Steinkopf over Kowalski. I think what your honor is getting at is that I think the arbitrator and the commission thoroughly  Dr. Kowalski repeatedly in his testimony qualified his knowledge of the purpose of that steroid shot. He stated that, of course this is after the fact, he repeatedly stated I don't know whether she received that steroid shot into the left hip, like for pain to the left hip, meaning there would have been an indication that there had been a fall in an actual incident, or whether or not it was for sinuses. But to him it did not make any difference, because the issue of the steroid shot was not whether or not it proved or disproved an accident occurred or not, it was whether or not the steroid resulted in the avascular necrosis. And the steroids is a known cause of avascular necrosis, and interestingly enough, by definition an avascular necrosis is going to develop later. Dr. Kowalski tested 8 to 12 months, and sure enough that's what happened. But the steroid shot and the timing of the avascular necrosis matched up with the fall. What's the definition of idiopathic? I'm sorry? What does idiopathic mean? Idiopathic means there's no known cause. And Dr. Steinkopf's opinion was that the claimant's condition was idiopathic. That's true. If there is no known cause, how could she recover? How could she what? Recover in workers' common, if there's no known cause. Oh, well certainly if Dr. Steinkopf's opinion is adopted and it's determined that it was idiopathic is the better opinion, then she wouldn't be allowed to call it, because that is known. So then the question that I have, I suppose, is why couldn't the commission credit Dr. Steinkopf's opinion over Dr. Kowalski? Because their adoption of Dr. Steinkopf's opinion, when you weigh that and balance that against Dr. Kowalski's opinion, falls well short and is against the manifest way to the evidence. Well, here's one reason why. One reason why is that Dr. Steinkopf did not even see the client. Dr. Steinkopf's initial written report actually didn't even say it was idiopathic. All Dr. Steinkopf's initial written report, which was records review only, all it said was it could be the steroids, but it wasn't the fall. Oh, and by the reason, the reason it wasn't the fall was because it was not a fracture or a dislocation, and you cannot get avascular necrosis on a blunt trauma unless it was a fracture or dislocation. But Dr. Kowalski repudiates that, clearly. Well, okay, so Dr. Kowalski repudiates it, and the commission's got to make a decision on which one they believe. They're both MDs, aren't they? Well, well, when the commission or this body weighs what... No, we don't weigh. We don't weigh. We make a determination as to whether the commission's decision is against the manifest way to the evidence, i.e., whether the opposite of conclusion is clearly apparent. And generally, the cases say if there is any competent evidence in the record to support the decision of the commission, it must be affirmed, regardless of how we would have decided it. I believe, though, that the credibility of the doctor's opinion is also in play in these decisions. Let's talk about that, because, you know, you've given your statement, and I think you're doing an admirable job of trying to pick apart Sheinkopf's opinion, but what about this? And this was troubling the commission. It was Kowalski's understanding that shortly after the fall, the claimant's patients saw medical care for the hip injury and received a steroid injection for the injury. However, the record clearly shows she did not seek treatment for injury to the hip approximate to the time of the fall. That is true. So you've got one inaccuracy to start out with Kowalski's opinion. They also cite, quote, unquote, the equivocal nature of Kowalski's opinion, because he testifies it was impossible for him to tell whether the claimant's fall or the use of steroids absolutely caused the necrosis. And he concluded that the trauma could be equally likely. So you've got an inaccuracy in his understanding of the medical history. You've got an equivocal opinion on the causation. And then you've got Sheinkopf. So you're saying that, obviously, as you must, Kowalski's opinion is superior to Sheinkopf. Obviously, the commission didn't find that, and they point to several legitimate reasons why not. I don't think those are legitimate reasons. I think that it's not that Dr. Kowalski had inconsistent statements. Dr. Kowalski repeatedly said, it is true that Kowalski said, I don't know whether the steroid shot was for the fall or whether it was for sinuses, but that's not an inconsistent statement that goes to his credibility. Well, if it was an inconsistent statement, but if his opinion is based on a flawed understanding of medical history, doesn't that weigh against his opinion? But he goes on to say, he goes, but even Kowalski repeatedly says, but it doesn't make any difference. Because when Kowalski, that whole issue right there, that narrow issue only involved whether or not the steroid resulted, the steroid injection resulted in the avascular necrosis because the timing of that injection matched up with the timing of the fall. That was that narrow issue. And we subsequently learned, not only through Dr. Sheinkopf, that he completely ruled out that the steroid could be a cause of it, but they obtained another doctor's report and provided some additional records, and he also conclusively proved that the steroid injection had nothing to do with the avascular necrosis. And that's why we're only left with whether it was the fall or idiopathic. And the commission makes that decision. You can point to problems, I think objectively, you might ask or point out as the testimony of both doctors. How did we conclusively prove all this, by the way? Because you mean Kowalski said so? How do you mean that the steroid had nothing to do with the avascular necrosis? You used the word conclusively. Oh, well, actually, the irony is, is that Dr. Kowalski, at the time we took his testimony, he didn't know one way or the other. Right. Okay. But he admitted that, again, that he was just talking about the cause. Yes. Dr. Sheinkopf, also at the time of his report, but at the time of his report, he also didn't know. But by the time of his testimony, he did know, and that's because the respondent had provided additional records. In fact, those records consisted of the petitioner's pharmaceutical records, the history of all the medicines she was taking, because all doctors seemed to agree that although a minor trauma would be rare, but not unheard of to cause avascular necrosis, very minimal use of steroids would also be very rare, and they like to see a long, consistent course of steroids. And the pharmaceutical records proved there was not a long, consistent course of steroids, and the respondent's second doctor stated that. So that's how it became conclusive.  After receiving additional evidence after Sheinkopf's and Kowalski's deposition, which were her pharmaceutical records. So one other thing I'd like to point out is Sheinkopf's opinions, among other things, appeared to be primarily based upon the fact that there was a low-impact, no-trauma fall and he on testimony, that's what his report said, and on testimony he stated that, well, the reason I assumed it was low-impact, no-trauma was because there was no emergency room treatment. He then admitted, of course, that he had not talked to Sally to ask her about the force of the fall. Well, there was a gap, was there not, between this alleged fall and her presenting for treatment, right? Eight months. Oh, how long was that gap? You mean between the treatment for her sinuses or the treatment for the avascular necrosis? Well, what was the first time she saw anybody after this alleged fall? Oh, within a week. Within a week, like what? Within a week of the fall. Yeah, that blame the what? That was for sinuses. That's admitted. I mean, there's no dispute about that. There's no question that the petitioner saw her family doctor three times within four or five weeks of the initial fall. Four sinuses. Four sinuses. Well, you're emphasizing the impact of this fall. If the impact was so severe, why is she going for weeks to talk about sinuses and never mentions the fall to anybody? Okay, if Your Honor interpreted that to mean that I was alleging that the fall was severe, then I take that back. I'm not saying the fall was severe. One of the issues is that Kowalski is the one who said, listen, both doctors understood that typically an avascular necrosis is going to require a fracture or a dislocation, but Kowalski says, however, albeit very rare, I believe that a minor trauma, if there was blunt force, some sort of blunt trauma to the hip, it could have caused this and the timing matches up perfect. And he does say that, but again, without belaboring it, does the commission have to believe him over Schenkel? I think that the commission should clearly believe Dr. Kowalski because he, not only is he the treating physician, and I don't mean that there's some, I understand there's no treating physician rule, but he's the one who observed Sally Lindville, he's the one who followed her over time, and more importantly, he was the one who was able to talk to her. She testified that she had some, the claimant testified that she had some bruising and was sore, but she didn't miss any word. So there's no doubt that we have a minor trauma to the hip, and Dr. Kowalski said even he himself had seen that. I think that when you, the commission, it's against the manifest way to the evidence for the commission to adopt the opinion of a respondent's doctor who has not seen the petitioner to talk to her, when the central issue is perhaps the magnitude or the impact of that fault. Isn't that done all the time? Does the commission believe, you know, a doctor that's not the treating physician, is that that unusual? No, but I think it is slightly unusual in a situation where the issue boils down to whether or not the respondent's doctor had the opportunity to take a history from the claimant herself, and you compare that versus the treating physician who, of course, took her history. Let me ask you one final question. In the real world, if somebody falls, and sustains a fall of any significance, and then a week later, they go to the doctor, they're talking about sinuses, and it goes on for weeks, they never mention the fall at all, doesn't seem unusual to you? I'll say that, let me address that in two ways. Number one, I've repeatedly seen in my practice that my clients and injured people will not report an injury to a doctor they go to see for one thing, but will definitely report it to a doctor that they're going to see for that injury. So in other words, I might see two contemporaneous medical records about the same time. One's to the family doctor that's not a mention of anything, and then one's to the specialist, and there is a mention, and the reason they didn't mention it to the family doctor was because they weren't going to see the family doctor for that incident. That's number one, but that's not the issue here. But number two is, I don't think it's necessarily unusual if, in fact, which is admitted that it was a relatively minor trauma that rarely causes avascular necrosis, but is known to happen, that she felt it may have gone away. She had reported the injury to ICON. I mean, they knew about the injury. It wasn't like there was an argument. And that's important, because the arbitrator felt it was, he didn't seem to understand that it had been reported to the injury. I think he also attached some questions about whether the accident even occurred in the first place because of that, but there was a report of injury, and that's admitted. Counsel, your time is up. You'll have time to respond. All right, thank you. Counsel, you may respond. May I please report to the court? Good morning, counsel. My name is Kevin Deuschel. I represent the respondent, ICON, in this manner. If I may be allowed to pick up where Mr. McGovern left off, I can't speak for the other clients that Mr. McGovern was referring to when the court asked him about why Ms. Lindvall wouldn't have reported the condition to her doctor. What I can say, however, is that the record in this matter has no explanation as to why she didn't report anything to her doctor in her initial visits. There's no evidence or testimony about that. That's correct. The record does clearly show that the first time, as the court noted, that she sought treatment for a condition or symptoms related to the hip was in December of 2008, bearing in mind this was an April of 2008 accident. In addition to that, I would point to the court that she did not report a fall to her doctors until February of 2009. How much longer was that after the fall? Well, we're about 10 months after the fall before. The first time she mentioned the fall to the doctors? That's correct. Almost a year later? Approximately 10 months. Well, why is that all important? I mean, she has a problem with the hip. She goes and sees an orthopod and examines it. And, you know, later on, she said, asked the question, how did you get this necrosis diagnosis? How could this happen? And do we have any testimony that the orthopod said, well, there's another? Because there are many reasons this possibly could happen. And then mentioned something about a fall, a trip or something. She says, aha, I did have one. Well, the absence in the reporting of symptoms is important to this court because it aligns with the opinion of Dr. Sheinkopf. It supports his conclusion. Clearly the doctors, Kowalski, the treating doctor and Sheinkopf have different opinions. Well, now, is there any disagreement among the medical community that she has this necrosis? It's not disputed in this case. The condition is not disputed. Okay. So how does it develop? When does it start appearing that the effects of necrosis? Is there anything in the record to suggest when? The only thing that we can tell from the record is that she did not seek medical treatment for the symptoms related to the necrosis until December. Correct. Correct. There are three choices in the record. It either is the result of trauma, it's the result of steroid use or it's idiopathic and has no known cause. Now, avascular necrosis in the femoral head generally does accompany a fracture. It is generally a result of a fracture. One trauma to the femoral head, you get avascular necrosis. But in this particular case, the petitioner's doctor was unsure really whether it was a result of trauma or steroid use. Is that correct? That's correct. Okay. So now the question becomes what was the steroid use for? Why did she get a steroid injection? Well, the record does, I think the record shows that the steroid was in the initial weeks following the accident when she first saw treatment for the first sort of treatment for what? For her sinuses. For her sinuses. So if the steroid use was related to treatment for sinuses, it has absolutely no causal connection to a fall, does it? Well, I would agree with you. And candidly, I would like to point to the steroids as a cause of the avascular necrosis. However, I don't think that the record allows me that luxury. No, you don't. Your only luxury is to support ShineFact's opinion. That's correct. But my question is, how have we eliminated steroid use for sinuses as a cause of avascular necrosis? As related to Mrs. Linville, the respondent's doctors did provide an opinion that they reviewed the amount of steroids. This is a little bit unusual because I feel like I'm arguing against a possible good explanation for the cause. But the respondent's doctors did establish that the steroid use is not the cause of the avascular necrosis in this case. So we're now left with idiopathic or fall? Your Honor's question aligns with the testimony of Dr. Sheinkopf on that point, yes. And so now Dr. Sheinkopf says idiopathic, their doctor says fall, and the Commission says we're going along with Sheinkopf. That is what happened in this matter, yes. Well, we can certainly find that. I guess the question I would ask you is, why would the Commission adopt Sheinkopf over Kowalski? We were alluding to discrepancies in the foundation. We have some impediments to the foundation for Kowalski's opinion. So point us to why Sheinkopf's opinion would be arguably superior to Kowalski in any event. Absolutely. I think broadly you can look at this in two ways. One, the opinion of Dr. Sheinkopf stands on its own. If you take Dr. Kowalski out of the equation, there is evidence, testimony, facts to support his conclusion that the avascular necrosis is not related to the fall. It's Dr. Kowalski's opinion that the trauma in this matter did not rise to the level that he as a medical professional associates with the cause of avascular necrosis. As counsel related, as Dr. Sheinkopf testified, he associates the level of trauma with a fracture or a larger impact that disrupts the flow of blood to, or the blood supply to the femoral head. In this case, not only was there no radiographic imaging suggesting a fracture or a dislocation, he also concluded from the absence of immediate medical treatment that the trauma involved in the fall did not rise to such a level that one would expect. Wait a minute. Isn't it actually much simpler than that? Neither of these doctors base their opinions on consultation with the entrails of chickens. They're both based on medical opinions. Is that correct? That's correct. Who gets to pick which one they accept? The commission. As long as they're valid opinions, then it's up to the commission to determine which one that they pick, not us. I would not argue that point. If you can disqualify the entire opinion, because it's just totally nonsensical, that's a different story. But we don't have that here, do we? As I alluded to when I began answering the question, one could look at this broadly in two ways, and again, one is that Shinehouse's opinion stands on its own. The second way to look at it is to do just that, to, at least in my position, try to eliminate one of those, and that would obviously be the opinion of Dr. Kovalsky. You don't have to. If the first one is it stands on its own, there's no superior opinion here. There's two opinions. Each opinion may have a proper foundation that would support one direction or the other direction. So under manifest weight of the evidence standard, if they're both equal, none is, opposite conclusion is clearly apparent. You can't find that. So I would say your position would be... I'm sorry. In closing, your position would be? In closing, my position would be, I certainly agree with the opinion of the justices that one could say that the opinion of Dr. Sheinkopf stands on its own, that it's not against the manifest weight of the evidence to disturb that conclusion. Thank you, Counsel. Thank you. Counsel, you may reply. A little housekeeping matter. She did first, when she went and saw Dr. Julie Thiel, her chiropractor, in December of 2008, and the fall was reported at that time. It wasn't until February of 2009, just to make the record clear. And the other thing is, I think it's interesting, is, I mean, how would a copier salesman know what caused avascular neprosis? A copier salesman doesn't have to know. But a copier salesman ought to report to a doctor that she fell on her hip and her hip hurts. What if it didn't hurt her? Apparently it did not hurt enough for her to do that. In which case, she's got a doctor that says, in my opinion, it was caused by the fall. And they got a doctor that says, in my opinion, it was idiopathic. And now the question becomes, who makes the decisions to which opinion to choose? And it's not us. It's the commission. Unless you can establish that shying cop's opinion is tantamount to nonsense, and we ought to eliminate it from the record, and just take it out because there's absolutely no foundation in medical science, you're stuck with it. And the opposite conclusion is not clearly apparent. Well, I mean, I guess the implication, Your Honor, is that if a commission chooses a doctor's opinion, but it's nonsense, it means that the commission ruled wrong. I just said the opposite of that. I said if it's nonsense and there is no foundation for it, we can eliminate it. On that ground, you'll win with the other opinion. But if both of them are based upon medical reasons, and there is no basis to attack them on foundation, it clearly, under Odette, is the commission's determination as to which of conflicting medical opinions they will accept. But on the spectrum of an opinion being zem-like truth, and on the other end of the spectrum, it being utter nonsense, somewhere in there is against the manifest way to the evidence. And it's not on one or the other. And the soundness of the doctor's interpretation and the rendering of his opinion of the interpretation of those medical records, and his opinion based upon that, plays a vital role and a significant role in decisions. What mistake did Shantel make? Did he misinterpret medical records? He... Yes. What did he misinterpret? He, with absolute certainty, decided that since there was no emergency room medical... Do you know Mitchell Shantel? No, I don't. I do. Okay. He's never been uncertain about anything in his life. Well, he was not uncertain about this one either. He was very certain that since there was no... And his testimony generally is exactly that. I am certain this is the cause. Now, unless you can attack the basis upon which he makes that conclusion, you've got a problem. Let me just say this. You should not read anything into our question. As to how we're going to decide the case, because we will review the answer. We're just trying to tell you the general principle, which I think you'd have to concede is generally true. If it's a battle of conflicting medical opinions, the weight and the credibility to be afforded to the opinion really is the commission's call. It's a general rule. I certainly understand that. But nevertheless, I would ask for this body to reverse the commission and award benefits for this sort of thing. Thank you. Thank you, Counsel Bullock. This matter will be taken under advisement. Written disposition will issue. Please call.